IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BJS INSURANCE, LLC,
    *Plaintiff*,

v.

HOUSTON CASUALTY CO.,
    *Defendant*

Case No. 24-cv-974-ABA

**MEMORANDUM OPINION**

Plaintiff BJS Insurance, LLC ("BJS") is a life insurance brokerage firm. It was insured under a professional liability policy issued by Defendant Houston Casualty Company ("HCC"). After BJS was sued in a bankruptcy adversary proceeding, BJS filed a claim with HCC for coverage. HCC denied the claim, both as to defense costs and indemnification. BJS has brought this case challenging that denial.

BJS has filed a motion for partial summary judgment, contending that as a matter of law, HCC has a duty to defend it, regardless of whether HCC will ultimately be liable for indemnification. HCC has filed a cross-motion for partial summary judgment, contending the undisputed evidence establishes that it has no duty to defend. (Both parties reserve their rights to file dispositive motions as to indemnification.) For the reasons that follow, the Court denies both motions for partial summary judgment.

1

I.      **BACKGROUND**[1]

   A.   **BJS and JJM**

BJS is a life insurance brokerage firm in Maryland that has been in business since 2010. ECF No. 18-2 ¶ 2. Its principal and managing member is Barry J. Steinfelder. *Id.* ¶ 1, 2. BJS sold life insurance policies, and also helped some of its clients "secure premium financing." *Id.* ¶¶ 6-7.

In addition to operating through BJS, Mr. Steinfelder also controls another entity, JJM, LLC ("JJM"). *Id.* ¶ 4. Mr. Steinfelder describes JJM as a "company used in connection with the insurance business of BJS" as to which BJS "controls the right to elect, appoint or designate more the members who control JJM," which Steinfelder contends renders JJM "a subsidiary of BJS as that term is defined in the policy issued by Houston Casualty Company." *Id.*

   B.   **The policy**

HCC issued Insurance Agents Professional Liability Insurance Policy No. H722-118915 to BJS for the policy period January 13, 2022 to January 13, 2023 (the "Policy"). ECF No. 23-4 at 4.[2] The Policy's Professional Services Liability Coverage Insuring Agreement provides, in relevant part, as follows (the bold text appears in the original):

---

[1] In reviewing a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. *Tolan v. Cotton*, 572 U.S. 650, 656-67 (2014). Because there are cross motions for summary judgment, this section incorporates facts from both parties, but the Court applies this standard separately to each motion. *See Monumental Paving & Excavating, Inc. v. Penn. Mfrs.' Ass'n. Ins. Co.*, 176 F.3d 794, 797 (4th Cir. 1999).

[2] Citations to page numbers refer to the number appearing in the CM/ECF header for this and the other filings referenced herein, which may not align with a document's original page numbering.

> The Company shall pay **Loss** and **Claim Expenses**, in excess of the Deductible and subject always to this Policy's Limit of Liability, that an **Insured** shall become legally obligated to pay as a result of a **Claim** made against an **Insured** for a **Wrongful Act** arising from **Professional Services**, provided always that: . . . an **Insured's** partners, principals, officers, directors, **Managers** or risk managers had no knowledge of any circumstances, dispute, situation or incident that could reasonably have been expected to give rise to such **Claim** prior to the Knowledge Date stated in the Declaration of this Policy.

*Id*. at 41. The "Knowledge Date" stated in the Policy's Declaration was January 13, 2020. *Id*. at 4.

The policy defines "**Wrongful Act**" as "any actual or alleged negligent act, error or omission committed or allegedly committed by an **Insured** solely in connection with the rendering of **Professional Services**." *Id*. at 54. **Professional Services**, in turn, are defined as follows:

> [O]nly the following activities undertaken by a licensed insurance agent, insurance broker, managing general agent, surplus lines broker, wholesale insurance broker, underwriting manager, managing general underwriter, claims adjuster, and/or program administrator:
>
> (1) the soliciting, placing, selling, or servicing of any of the following:
>
> a. property and casualty insurance;
>
> b. life insurance, accident and health insurance, workers compensation insurance as part of a 24-hour accident and health insurance product, long-term care insurance, disability income insurance, or fixed annuities;
>
> c. variable products, including, but not limited to, variable annuities, flexible and scheduled premium

> annuities, and variable life insurance, but only as a licensed representative to provide such products; or
>
> d. employee benefit plans, including, but not limited to, Group Plans, Group or Ordinary Pension or Profit Sharing Plans, 401-(K) or 501(b) Plans, Retirement Annuities, Life, Accident and Health or Disability Plans;
>
> (2) Insurance consulting and expert witness services in connection with insurance related matters;
>
> (3) appraising real or personal property for a client in connection with the products set forth above;
>
> (4) arrangement of premium financing for a client in connection with the placement of insurance coverage;
>
> (5) safety consulting, loss control services, teaching insurance/risk management courses/seminars, and risk management services for a client in connection with the products set forth above;
>
> (6) tax advice which is an incidental part of the rendering of **Professional Services**; and
>
> (7) services as a notary public in connection with soliciting, placing, selling, or servicing of insurance coverage.
>
> "**Professional Services**" shall include services performed for others, by or on behalf of an Insured, on or via the **Insured's Computer System**, email, telecommunication or similar system.
>
> "**Professional Services**" shall not include the sale, attempted sale, servicing, or any activities in connection with securities, including, but not limited to, stocks, bonds, limited partnerships, promissory notes, viatical settlements, leasing arrangements, real estate trusts, or investment participation or pooling arrangements.

*Id.* at 51-52.

### C. The *JTR* litigation

As noted above, when BJS brokered life insurance policies for its clients, sometimes it arranged for premium financing for those policies. ECF No. 18-2 ¶¶ 7-8. One entity that provided "premium financing" to BJS's clients was JTR 1, LLC f/d/b/a JTR, LLC ("JTR"), a company managed by Jeffrey Covelli. *Id.* ¶ 5, 9. The premium financing arrangements apparently took various forms. One such arrangement was that when certain policies as to which JTR had provided financing "paid out," or when JTR's loans were "transferred to a third party," JTR and BJS "shared the profits on a 50/50 basis from these transactions," and also split expenses incurred from structuring the deals. ECF No. 18-2 ¶¶ 10-11.

JTR filed for Chapter 7 bankruptcy in 2020, in the United States Bankruptcy Court for the Western District of North Carolina. *In re JTR1, LLC f/d/b/a JTR, LLC*, Case No. 20-30141 (Bankr. W.D.N.C.). A. Burton Shuford was appointed as trustee. The trustee filed various adversary actions. One of those adversary actions was filed against BJS and JJM, captioned *Shuford v. BJS Ins., LLC et al.*, Adv. Proc No. 22-03018 (Bankr. W.D.N.C.) (filed in this Court as ECF No. 2-2) (the "Trustee Lawsuit").

The Trustee Lawsuit, which was filed on February 4, 2022, gave rise to the current coverage dispute. The trustee alleged, among other things, that JTR had made ten transfers to BJS and/or JJM that constituted "transfer of an interest of [JTR] in property"; that JTR "did not owe debts to either [BJS or JJM]" and "did not receive reasonably equivalent value in exchange" for the transfers; that none of the transfers was "made pursuant to a contract or negotiated payment agreement"; and that JTR "was insolvent at the time of each Transfer." ECF No. 2-2 at 24-25. In total, the ten transfers

5

as to which the Trustee sought avoidance, at least pursuant to its initial complaint, totaled $3,772,354. *Id.* at 24.[3]

The complaint in the Trustee Lawsuit raised six counts, several of which were offered in the alternative to other counts:

- Count 1 sought the avoidance of all ten transfers based on 28 U.S.C. §§ 3304(a)(1), which states that a transfer by a debtor is fraudulent if the debtor makes that transfer without receiving a reasonably equivalent value in exchange when the debtor is insolvent (or when the transfer causes the debtor to become insolvent). *See* ECF No. 2-2 ¶¶ 167-76; 28 U.S.C. §§ 3401(a)(1).

- Count 2, in the alternative, sought the avoidance of all ten transfers based on 28 U.S.C. §§ 3304(b)(1)(A), which states that a transfer by a debtor is fraudulent if the debtor makes the transfer "with actual intent to hinder, delay, or defraud a creditor." *See* ECF No. 2-2 ¶¶ 177-86; 28 U.S.C. §§ 3304(b)(1)(A).

- Count 3, in the alternative, sought the avoidance of all ten transfers based on 28 U.S.C. §§ 3304(b)(1)(B), which states that a transfer by a debtor is fraudulent if the debtor makes the transfer without receiving a reasonably equivalent value in exchange if the debtor "was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or . . . intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due." *See* ECF No. 2-2 ¶¶ 187-95; 28 U.S.C. 3304(b)(1)(B).

---

[3] According to a motion the Trustee filed with the bankruptcy court in July 2024, seeking approval of a settlement between the Trustee and BJS and JJM (along with other parties), "[f]ollowing resolution of the Motions to Dismiss and the provision of additional information to the Trustee, which eliminated certain claims, the remaining transfers at issue in the BJS/JJM Lawsuit totaled known transfers of $584,561.00." ECF No. 18-10 at 5 ¶ 14.

6

- Count 4 sought avoidance of nine of the transfers based on North Carolina's Uniform Voidable Transactions Act.[4]

- Count 5 sought avoidance of two of the transfers based on 11 U.S.C. § 548, which allows for avoidance of certain fraudulent transfers. *See* ECF No. 2-2 ¶¶ 207-18; 11 U.S.C. § 548.

- Count 6 alleges BJS was the initial transferee of each of the challenged transfers, and JJM was the entity for whose benefit several of the transfers were made, and therefore that JTR is entitled to recover the avoided transfers from BJS and JJM. *See* ECF No. 2-2 ¶¶ 219-26; 11 U.S.C. § 550.

D.   **BJS's claim for coverage, and HCC's denial**

Shortly after the Trustee Lawsuit was filed in February 2022, BJS and JJM made a claim with HCC for coverage (both as to costs of defense and indemnification). ECF No. 18-2, ¶ 22. In April 2022, HCC denied the claim. *Id*. ¶ 23; *see also* ECF No. 18-6 (denial letter stating in part, "the Policy will not provide coverage to either BJS or JJM in connection with this matter"). In July 2023, BJS/JJM wrote to HCC "demanding coverage for the duty to defend." ECF No. 18-2, ¶ 24. HCC again denied the claim and refused to participate in settlement negotiations. *Id*. ¶¶ 24, 25.

In late 2023, the JTR trustee reached a settlement agreement with BJS and JJM, as a part of a settlement that also included other defendants in related adversary proceedings. ECF No. 18-10 at 14-22 (settlement agreement). Pursuant to that settlement, the defendants (including BJS and JTR) collectively agreed to pay $200,000 in settlement of the Trustee's suit. ECF No. 2-3 at 3. The bankruptcy court approved this settlement. *See* ECF No. 18-10. The present record does not reveal what portion of the $200,000 settlement was paid by BJS and JJM (as opposed to the other defendants).

---

[4] The one transfer the Trustee does not challenge in Count 4 is a transfer of $545,500 to BJS in December 2015. *See* ECF No. 2-2 ¶ 197.

7

**E.     This case**

In January 2024, BJS filed a complaint against HCC in the Circuit Court for Baltimore County. *See* ECF No. 2. HCC removed the action to this Court. *See* ECF No. 1. BJS's complaint alleged two breach of contract claims, based on HCC's alleged duty to defend (Count 1) and HCC's alleged duty to indemnify (Count 2). ECF No. 2, ¶¶ 65-69, 70-76. HCC answered the complaint in April 2024. *See* ECF No. 8.

In July 2024, Plaintiff filed a motion for partial summary judgment, which addressed only the duty to defend claim (count 1 of the initial complaint). *See* ECF No. 18, 18-1. The motion stated that Plaintiff "anticipated that dispositive motions will later be filed as to [HCC's] duty to indemnify," following discovery. ECF No. 18-1 at 5 n.1. HCC then filed a cross motion for summary judgment. ECF No. 23. In the cross motion, HCC "respond[ed] only to the [duty to defend] issue," but noted that "because there is no duty to defend, HCC is entitled to judgment in its favor" on the duty to indemnify issue. *Id*. at 7, n.1. The parties filed opposition and reply briefs on each motion. *See* ECF Nos. 23 (Defendant's opposition to Plaintiff's motion), 26 (Plaintiff's opposition to the cross motion), 27 (Defendant's reply brief in support of the cross motion),

**II.    STANDARD OF REVIEW**

A party may move for summary judgment on any "claim or defense" by showing "there is no genuine dispute as to any material fact" and that the party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reviewing a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party, *Tolan*, 572 U.S. at 656-67, and draws all reasonable inferences in its favor. *Scott v. Harris*, 550 U.S. 372, 378 (2007). This standard of review does not change where, as

here, there are cross motions for summary judgment. *See Monumental Paving*, 176 F.3d at 797. The Court considers each motion separately under the Rule 56 standard. *Id.*

## III. DISCUSSION

The duty to defend is broader than the duty to indemnify. *Walk v. Hartford Cas. Ins. Co.*, 382 Md. 1, 15 (2004).[5] That is, an insurer might have a duty to cover litigation costs under a policy even if it might not ultimately be obligated to indemnify. *Aetna Cas. Sur. Co. v. Cochran*, 337 Md. 98, 107 (1995). Here, construing the Policy liberally in the policyholder's favor, as the Court must do, *see Springer v. Erie Ins. Exch.*, 439 Md. 142, 167 (2014), and because there are genuine disputes of material fact that could affect "the coverage and . . . defenses" under the Policy (including BJS's knowledge of JTR's financial situation prior to its procurement of the Policy), *see St. Paul Fire & Marine Ins. Co. v. Pryseski*, 292 Md. 187, 193 (1981), neither BJS nor HCC is entitled to judgment as a matter of law with respect to the duty to defend.

### A. HCC has not established as a matter of law that it did not have a duty to defend.

The parties' main dispute with respect to the duty to defend is over whether any of the allegations in the Trustee Lawsuit may be covered by BJS's insurance policy, such that the lawsuit triggered a duty to defend. As noted above, the HCC policy provided coverage for loss and claim expenses as a result of claims made against BJS "for a **Wrongful Act** arising from **Professional Services**" (unless the Insured knew or "reasonably have been expected to give rise to such **Claim** prior to [January 13, 2020]"). ECF No. 23-4 at 41. The policy defines "**Wrongful Act**" as "any actual or

---

[5] As noted above, Plaintiff only seeks summary judgment on the duty to defend at this stage. *See* ECF No. 18 at 1 & n.1.

alleged negligent act, error or omission committed or allegedly committed by an **Insured** solely in connection with the rendering of **Professional Services**." *Id.* at 54. The definition of "Professional Services" is set out above.

### i. The parties' arguments

BJS argues that the Trustee's allegations were broad and, at least when the Policy is liberally construed, alleged that BJS had committed a "negligent act, error or omission . . . in connection with the rendering of Professional Services." ECF No. 18-1 at 24 (quoting the Policy). BJS emphasizes that the Trustee Lawsuit does not allege that BJS itself engaged in any fraudulent activity, but that it does allege "that in dealing with an insolvent entity," and in accepting the transferred funds (and not returning them), BJS and JJM "did so in error or were negligent in not ascertaining [JTR's] financial solvency." *Id.* at 25; *see also* ECF No. 26 at 12 (Plaintiff's statement that the Trustee Lawsuit "alleges that BJS received payments from JTR to which it was not entitled"). BJS also argues that the claims in the Trustee Lawsuit relate to the "Professional Services" of "soliciting, placing, selling, or servicing" life insurance policies and the "arrangement of premium financing for a client," both of which fall within the definition of "Professional Services" under the Policy. ECF No. 18-1 at 20-22.

HCC argues the Trustee Lawsuit did not trigger a duty to defend (or to indemnify) for two reasons. First, HCC argues that the Trustee Lawsuit did not allege any "wrongful act" by BJS because the Trustee Lawsuit seeks to avoid the transfers under a strict liability standard—in other words, that the Trustee's claims did not require the Trustee to prove that BJS was negligent, but rather solely that BJS *received and did not return* funds from JTR that JTR should not have transferred to BJS in the first place. ECF No. 23 at 17-18. Second, HCC contends that even if BJS's receipt and

retention of the transfers at issue were "Wrongful Acts" (at least as alleged by the Trustee), they were not Wrongful Acts "arising from Professional Services," which is another prerequisite for coverage. *Id.* at 19-23. HCC argues that, based on the "actual claims asserted against the insured," it did not have a duty to defend, regardless of whether a duty to defend may have been triggered by potential "unasserted claims" by the Trustee. *Id.* at 16.

### ii.     Legal standard for the duty to defend

The duty to defend is a contractual duty arising out of the terms of a liability insurance policy, *Litz v. State Farm Fire & Cas. Co.*, 346 Md. 217, 225 (1997), and is broader than the duty to indemnify. *Walk*, 382 Md. at 15. *See also Brohawn v. Transamerica Ins. Co.*, 276 Md. 396, 409-10 (1975) ("Although th[is] type of policy . . . is most often referred to as liability insurance, it is 'litigation insurance' as well, protecting the insured from the expense of defending suits brought against him.") (citation omitted). Maryland courts have established a two-part inquiry for the duty to defend:

> First, the court must determine "the coverage and . . . the defenses under the terms and requirements of the insurance policy." [*St. Paul Fire,* 292 Md. 187 (1981)]. This inquiry "focuses upon the language and requirements of the policy." *Id.* Second, focusing upon the allegations of the underlying suit, the court must determine whether the "allegations in the tort action potentially bring the tort claim within the policy's coverage." *Id.*

*Nautilus Ins. Co. v. BSA Ltd. P'ship*, 602 F. Supp. 2d 641, 648 (D. Md. 2009). As noted above, the duty to defend is "construed liberally in favor of the policyholder." *Springer*, 439 Md. at 167.

11

In the first part of the inquiry, the Court must determine the scope of coverage by "focus[ing] upon the language and requirements of the policy." *St. Paul Fire*, 292 Md. at 193. The foremost rule "of construction is to apply the terms of the insurance contract itself." *Springer*, 439 Md. at 158 (quoting *Bausch & Lomb Inc. v. Utica Mut. Ins. Co.*, 330 Md. 758, 779 (1993)). As a general matter, insurance policies are construed according to standard contract interpretation principles. *Moscarillo v. Prof'l Risk Mgmt. Servs., Inc.*, 398 Md. 529, 540 (2007). "Although Maryland does not follow the rule that insurance contracts should be construed against the insurer as a matter of course, any ambiguity will be construed liberally in favor of the insured and against the insurer as drafter of the instrument." *Maryland Cas. Co. v. Blackstone Int'l Ltd.*, 442 Md. 685, 695 (2015) (citation and internal quotation marks omitted).

In the second part of the duty-to-defend inquiry, the Court must determine whether the "allegations in the tort action potentially bring the tort claim within the policy's coverage." *St. Paul Fire*, 292 Md. at 193. Under the so-called "potentiality rule," the "mere possibility that the insurer will have to indemnify" (i.e., "that the claim *could* be covered by the policy") triggers a duty to defend. *Litz*, 346 Md. at 225 (emphasis added). "Even if a tort plaintiff does not allege facts which clearly bring the claim within or without the policy coverage, the insurer still must defend if there is a potentiality that the claim could be covered by the policy." *Blackstone Int'l*, 442 Md. at 695 (emphasis omitted) (quoting *Brohawn*, 276 Md. at 407-08). An insured may establish a potentiality of coverage, including by the use of extrinsic evidence, "by demonstrating that 'there is a reasonable potential that the issue triggering coverage will be generated at trial.'" *Walk*, 382 Md. at 21 (quoting *Cochran*, 337 Md. at 112).

### iii.  Analysis

As outlined in Section I.B above, the Policy requires HCC to "pay **Loss** and **Claim Expenses** . . . that an **Insured** shall become legally obligated to pay as a result of a **Claim** made against an **Insured** for a **Wrongful Act** arising from **Professional Services** . . . ." ECF No. 18-5 at 42. The parties appear to agree that the Trustee Lawsuit is a "claim," as defined by the policy. ECF No. 8-1 at 19 & ECF No. 23 at 14. They dispute the meanings of the terms "Wrongful Act" ("any actual or alleged negligent act, error or omission committed or allegedly committed by any Insured solely in connection with the rendering of Professional Services") and "Professional Services" (longer definition, set forth above). ECF No. 23-4 at 54.

Although HCC alleges that the policy language in this case, including the definition of "Wrongful Act," ECF No. 23-4 at 54, is "unambiguous," ECF No. 23 at 12, there is a potentially relevant ambiguity in the definition of "Wrongful Act." The term "negligent" could modify each of the terms that follow (*i.e.*, "negligent act," "negligent error," or "negligent omission"). Or it could modify *only* the term "act," meaning that "wrongful act" encompasses negligent acts, as well as any non-negligent alleged "error or omission . . . in connection with the rendering of Professional Services." The Court, however, does not need to determine which meaning governs because the Trustee Lawsuit triggered a duty to defend under either interpretation (unless knowledge BJS possessed prior to the Knowledge Date precluded coverage, discussed below).

Under the first interpretation of the Policy (*i.e.*, where "wrongful act" encompasses errors and omissions only if they are expressly alleged to have been *negligent*), the analysis is straightforward: any alleged failure of BJS to investigate the financial circumstances of JTR before accepting funds in connection with the disputed

transfers is an actual or alleged "negligent omission" because BJS's failure to investigate put those funds at risk of being "clawed back" by JTR's creditors. Under the alternative interpretation of the Policy, where errors or omissions that are not negligent were covered, BJS's receipt of the funds (and failure or refusal to return them) remains an "act" and BJS's failure to inquire about JTR's financial circumstances remains an alleged "error or omission."[6] Under either interpretation, and with "any ambiguity . . . construed liberally in favor of the insured," *Blackstone Int'l*, 442 Md. at 695, and also considering that step two of the analysis requires considering whether the Trustee's allegations "*potentially* bring the tort claim within the policy's coverage," *St. Paul Fire,* 292 Md. at 193 (emphasis added), the Trustee's claims related to BJS's receipt, acceptance, and retention of the funds potentially comprise an "actual or alleged negligent act, error or omission" under the Policy.

    BJS also has shown that the acts, errors or omissions at issue in the Trustee Lawsuit took place "in connection with" the provision of "professional services." Although HCC attempts to classify these activities as mere "billing and fee sharing practices" distinct from "professional services," ECF No. 23 at 22-23, BJS's receipt and retention of these funds (negligent or otherwise) is undoubtedly an act that originates from, flows from, or grows out of its work to "arrang[e] premium financing for a client in connection with the placement of insurance coverage." ECF No. 23 at 8 (quoting the

---

[6] HCC itself suggests that under one possible theory, Mr. Steinfelder had some knowledge about JTR's financial situation prior to these transfers. *See e.g.*, ECF No. 23 at 24. The Trustee Lawsuit likewise leaves open the possibility that Mr. Steinfelder knew something about JTR's financial position prior to or at the time of the transfers. *See* ECF No. 18-3 at 4 (alleging that Mr. Steinfelder and Mr. Covelli "have been business associates and friends for approximately 20 years," "have a history of business and personal transactions," and "sometimes speak as often as two to three times per day.").

Policy); *see also ACAS LLC v. Charter Oak Fire Ins. Co.*, 626 F. Supp. 3d 866, 874 (D. Md. 2022) ("Maryland courts interpret 'arising out of'—language substantively identical to 'arising from,' *see Spirtas Co. v. Fed. Ins. Co.*, 521 F.3d 833, 836 (8th Cir. 2008) (collecting cases)—'in accordance with its 'common understanding, namely, to mean originating from, growing out of, flowing from, or the like.'") (citing *M Consulting & Export, LLC v. Travelers Cas. Ins. Co.*, 2 F. Supp. 3d 730, 740 (D. Md. 2014), which was quoting *N. Assurance Co. v. EDP Floors, Inc.*, 311 Md. 217, 230 (1987)). Accordingly, BJS has established—at least for purposes of the duty to defend, *see St. Paul Fire*, 292 Md. at 192-93 (discussing the "potentiality" rule)—that its alleged acts in accepting and retaining funds from JTR in the challenged transfers, and any related errors or omissions in failing to conduct appropriate investigation about JTR's financial circumstances, were potentially alleged "Wrongful Acts" "committed . . . in connection with the rendering of Professional Services."

     The Trustee Lawsuit included multiple counts in the alternative, but the gravamen of the claims was that JTR wrongly continued to transfer funds to BJS as part of a profit-sharing agreement in spite of JTR's insolvency. *See, e.g.*, ECF No. 18-3, ¶¶ 86, 89 (Trustee alleging that BJS received a portion of the funds from the "Blair Settlement Funds prior to [JTR] receiving its full payment due on the Blair [premium financing note,] [which] constitutes a transfer of an interest of the Debtor in property"). The Trustee's claim against BJS was, in essence, an allegation that BJS wrongfully obtained, and wrongfully retained, those funds. As explained above, the wrongful collection and retention of funds from an insolvent entity in connection with the sale and premium financing of insurance policies at least potentially falls within the Policy's coverage. Accordingly, HCC's motion for summary judgment will be denied.

### B. HCC's Knowledge Date defense precludes summary judgment for BJS.

Although HCC is not entitled to judgment as a matter of law on the duty to defend for the reasons discussed above, BJS also is not entitled to judgment as a matter of law. The parties have not yet conducted discovery on BJS's knowledge of JTR's financial situation prior to BJS's acquisition of the Policy. *See* ECF No. 14 at 2-3 (scheduling order outlining the sequencing of summary judgment motions and discovery). Because that issue is material to whether HCC owed BJS a duty to defend, BJS's motion for summary judgment will be denied as well.

#### i. Standard for denying pre-discovery summary judgment motions as premature

In considering BJS's motion for summary judgment, the Court must view the evidence in the light most favorable to HCC and draw all inferences in its favor. *Anderson*, 477 U.S. at 255. "Generally speaking, 'summary judgment [must] be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Anderson*, 477 U.S. at 250 n.5). "If a party believes that more discovery is necessary for it to demonstrate a genuine issue of material fact, the proper course is to file a Rule 56([d]) affidavit." *Id.*[7] Courts "place great weight on

---

[7] Rule 56(d) provides, "When Facts Are Unavailable to the Nonmovant. If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d). Before 2010, that procedural requirement appeared in subsection (f) of Rule 56. *See* Fed. R. Civ. P. 56(6) advisory committee's note to the 2010 amendment ("Subdivision (d) carries forward without substantial change the provisions of former subdivision (f).").

16

the Rule 56[(d)] affidavit," *id.* at 244 (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)), and failure to file a Rule 56(d) affidavit or declaration can be "sufficient grounds to reject a claim" that there was inadequate opportunity for discovery. *Id.* at 246 n.19.

Nonetheless, in certain circumstances, it is proper to conclude that summary judgment would be "premature even when the opposing party [has] failed to file a [Rule 56] affidavit." *Id.* at 244 (citing cases); *see also Comm. for Nuclear Responsibility, Inc. v. Seaborg*, 463 F.2d 783, 787 (D.C. Cir. 1971) ("Summary judgment is only appropriate when there is no bona fide material issue, and Rule 56 clearly contemplates that the parties shall have opportunity for deposition in order to establish the existence of a material issue."). For example, when "fact-intensive issues . . . are involved, courts have not always insisted" on a Rule 56(d) affidavit. *Harrods*, 302 F.3d at 244. In general, when the non-moving party has had little to no opportunity to conduct discovery "through no fault of its own" and has adequately informed the district court that the motion is premature based on lack of discovery on a material issue, courts have not strictly adhered to the Rule 56(d) affidavit requirement. *Id.*; *see also id.* at 244-45 (a court may consider the issue of premature summary judgment when a party's objections "serve[] as the functional equivalent of an affidavit" and where the party was "not lax" in pursuing discovery) (quoting *First Chi. Int'l, v. United Exch. Co.*, 836 F.2d 1375, 1280-81 (D.C. Cir. 1988)).

###       ii.      Analysis

BJS is not entitled to judgment as a matter of law on the duty to defend because the parties have not yet completed discovery on whether BJS had "knowledge of any circumstances, dispute, situation or incident that could reasonably have been expected

to give rise to [the Trustee's] Claim prior to [January 13, 2020]." ECF No. 23-4 at 4, 41. "A fact is material if it might affect the outcome of the suit under the governing law." *Jones v. Chandrasuwan*, 820 F.3d 685, 691 (4th Cir. 2016) (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013)). Mr. Steinfelder's knowledge as of January 13, 2020 is a material fact because if, as of that date, he knew of circumstances that could reasonably have been expected to give rise to the Trustee Lawsuit, HCC could establish that there was no duty to defend. *See St. Paul Fire*, 292 Md. at 193.

Given the materiality of the fact at issue, this Court must next consider the considerations outlined in *Harrods* to determine whether it is appropriate to consider denial of the motion for summary judgment based on a lack of reasonable opportunity for discovery, notwithstanding the lack of a Rule 56(d) declaration.

One consideration is whether the nonmoving party "has adequately informed the district court that the motion is pre-mature and that more discovery is necessary." *Harrods*, 302 F.3d at 244; *see also id.* ("The purpose of the affidavit is . . . to afford the trial court the showing necessary to assess the merit of a party's opposition." (quoting *First Chi.*, 836 F.2d at 1380)). Here, in its response to Plaintiff's motion for summary judgment, *see* ECF No. 23 at 1, HCC explained the material fact at issue, its connection to the governing law, and HCC's intention to depose Mr. Steinfelder on the issue. *Id.* at 23-26. These details are sufficient to "afford [this Court] the showing necessary to assess the merit of a party's opposition." *Harrods*, 302 F.3d at 244 (citation omitted).

A second consideration is whether the nonmoving party has been "lax in pursuing discovery" or whether the party has had "little or no opportunity to conduct discovery" "through no fault of its own." *Harrods*, 302 F.3d at 244-45. Here, it appears the reason HCC has not conducted discovery on this factual issue (or at least had not at the time

that it submitted its motion) is the parties' agreement to set separate deadlines for dispositive motions on the duty to defend and the duty to indemnify, and to extend discovery through 60 days past this Court's ruling on the instant motions for summary judgment. *See* ECF No. 12 (parties' joint request in April 2024 to amend the tentative scheduling order); ECF 14 (marginal order approving the bifurcated briefing deadlines); ECF No. 31 (granting request to extend discovery deadline to 60 days following a ruling on these motions). In addition, HCC's counsel states in an affidavit that if HCC's motion for summary judgment were denied, "HCC intends to propound discovery and conduct depositions" regarding when Mr. Steinfelder "knew of circumstances reasonably likely to lead to the [Trustee] Lawsuit as well as on additional facts that preclude indemnity coverage for the settlement of the [Trustee] Lawsuit." ECF No 23-3, ¶ 9. The record thus reflects that any failure by HCC to conduct discovery on this material fact is not due to any negligence on HCC's part, but rather due to the parties' preferred sequencing for efficient litigation of this case.

There are three final points that support denying BJS's motion for summary judgment as premature. First, the question of Mr. Steinfelder's knowledge as of the Policy's Knowledge Date, and specifically whether he had knowledge that "could reasonably have been expected to give rise to" the Trustee Lawsuit, is a fact-specific inquiry. Second, HCC has provided a basis for its belief that Mr. Steinfelder might have had knowledge about JTR's financial situation as of the Knowledge Date. *See* ECF No. 23 at 24 (noting "the Underlying Lawsuit's allegations that Mr. Steinfelder and Mr. Covelli speak multiple times a day and are close friends and business partners"). Finally, although Mr. Steinfelder contends that "BJS and JJM were unaware that JTR was 'insolvent,'" ECF No. 18-2 at 2, the Trustee Lawsuit's allegations are not limited to issues

19

of insolvency, but also include allegations, for example, that BJS and JTR engaged in transactions where JTR did not receive "reasonably equivalent value." ECF No. 23 at 24-25; *see also* ECF No. 18-3, ¶ 171 (allegation in Count 1 of Trustee Lawsuit that JTR "did not receive reasonably equivalent value in exchange for any of the Transfers"). And in any event, the parties appear not to have conducted discovery on Mr. Steinfelder's knowledge on any of those issues, including JTR's insolvency.

For all of these reasons, at least absent discovery with respect to HCC's Knowledge Date defense, BJS's motion for summary judgment is premature.

## IV. CONCLUSION

For the foregoing reasons, the Court will deny Plaintiff BJS's motion for summary judgment, ECF No. 18, and Defendant HCC's cross-motion for summary judgment, ECF No. 23. An appropriate order follows.

Date:  March 31, 2025                             /s/
                                          Adam B. Abelson
                                          United States District Judge